UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| JASON S., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-669-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Jason S. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act, and his application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 13).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 8, 10. Plaintiff also filed a reply brief. *See* ECF No. 12. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 8) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 10) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed applications for DIB and SSI on January 18, 2019, alleging disability beginning June 29, 2018 (the disability onset date), due to: "(1) chronic fatigue syndrome; (2) Epstein Barr syndrome; (3) depression: (4) post-traumatic stress disorder; and (5) obsessive compulsive disorder." Transcript ("Tr.") 15, 84, 282. The claims were denied initially

on April 15, 2019, and on reconsideration on July 2, 2019, after which Plaintiff requested an administrative hearing. Tr. 15. On August 21, 2020, Administrative Law Judge Bryce Baird ("the ALJ") conducted a telephonic hearing.[1] Tr. 15. Plaintiff appeared and testified at the hearing and was represented by Kathryn Eastman, an attorney. *Id*. Richard Barry Hall, an impartial vocational expert, also appeared and testified. *Id*.

The ALJ issued an unfavorable decision on November 3, 2020, finding that Plaintiff was not disabled. Tr. 15-30. On April 14, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's November 3, 2020 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.    District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

---

[1] Due to the extraordinary circumstance presented by the Coronavirus Disease 2019 ("COVID-19") pandemic, all participants attended the hearing by telephone. Tr. 15.

## II.     The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

3

Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his November 3, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2017.

2. The claimant has not engaged in substantial gainful activity since September 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: depression, anxiety, obsessive-compulsive disorder ("OCD") and asthma (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[2] such that he can lift and carry on occasion up to 20 pounds, and lift and carry frequently up to 10 pounds. He could sit for up to six hours in an eight-hour day. He could stand or walk for up to six hours in an eight-hour day. He would be limited to occasional climbing of ramps or stairs, no climbing of ladders, ropes or scaffolds. He could perform frequent balancing, frequent stooping, occasional kneeling, occasional crouching, and no crawling. He would be limited to environments in which there is no concentrated exposure to pulmonary irritants, such as odors, fumes, dust, gases or poor ventilation. He would be limited to simple routine tasks that can be learned after a short demonstration, or within 30 days. He could have no more than occasional interaction with the public and coworkers, and work that does not require teamwork such as on a

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

production line, work which would require doing the same tasks every day with little variation in location, hours or tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 9, 1980 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 15-30.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on January 18, 2019, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 30. The ALJ also determined that based on the application for supplemental security income protectively filed on January 18, 2019, the claimant is not disabled under section 1614(a)(3)(A) of the Act. *Id.*

## <u>ANALYSIS</u>

Plaintiff asserts three points of error. First, Plaintiff argues that the ALJ failed to properly develop the record with evidence he knew was missing, *See* ECF No. 8-1 at 11-15. Specifically, Plaintiff complains that the ALJ erred in not requesting records from "Ayurvedic Herbalist" Karma Sonam Targee (Mr. Targee"), with Ancient Universal Medicine, even though Mr. Targee provided a medical source statement (Tr. 1016-19), and the ALJ referred to Plaintiff's treatment with Mr.

Targee in his decision. *See id*. Next, Plaintiff argues that the ALJ erred in finding that chronic fatigue syndrome was not a medically determinable impairment. *See id*. at 16-19. Finally, Plaintiff argues that the ALJ did not properly assess the supportability and consistency factors when considering the opinions of mental health providers Vivian Gerard, NP ("Ms. Gerard"), and Seaghan Coleman, LCSW-R ("Ms. Coleman"), and therefore, his findings were not supported by substantial evidence. *See id*. at 20-25.

In response, the Commissioner argues that the ALJ properly considered the totality of the evidence, including the opinion and medical evidence in the record, when determining the RFC and substantial evidence supports the ALJ's RFC determination. *See* ECF No. 10-1 at 19-24. The Commissioner also argues that the ALJ properly considered the opinion evidence under the new regulations, including the opinions of Ms. Gerard and Ms. Coleman, and his findings were supported by substantial evidence. *See id*. at 24-26. The Commissioner further argues that, because the ALJ had enough information in the record to reach a decision, he was not obligated to further develop the record as to Mr. Targee, who, in any event, is not a medical source under the regulations. *See id*. at 26-28. Finally, argues the Commissioner, the ALJ properly determined that chronic fatigue syndrome was not a medically determinable impairment,

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ properly considered all relevant medical and other evidence of record, and the ALJ's finding that Plaintiff could perform light work with additional limitations was supported by substantial evidence, including the treatment records, the opinions of internal medicine consultative examiner Hongbiao Liu, M.D. ("Dr. Liu"), and psychiatric consultative examiner Agnes R. Jonas, Psy.D. ("Dr. Jonas"), and the prior administrative medical findings of state agency medical consultants D. Miller, D.O. ("Dr. Miller"), and J. Lawrence, M.D. ("Dr. Lawrence"), as well as Plaintiff's daily activities and his relatively conservative treatment.  Accordingly, the Court finds no error in the ALJ's RFC finding.

Plaintiff alleges that he is unable to work due to excessive fatigue, chronic pain, major depressive disorder, anxiety disorder, and OCD. Tr. 58. Plaintiff was 40 years old at the time of the hearing. Tr. 41. He testified that he had a driver's license; he earned a bachelor's degree in fine arts; and he lived in a house with his mother. Tr. 51-52. The record indicates that Plaintiff worked at times during the relevant period, including as late as 2018 (Tr. 55-56, 954, 960, 1821); however, the ALJ determined that Plaintiff's work activity did not rise to the level of substantial gainful activity (Tr. 18).

On September 1, 2012, Plaintiff had an initial psychiatric evaluation with Brian Joseph, M.D. ("Dr. Joseph"). Tr. 937-39. Plaintiff reported he had been working as a supervisor at a catering company until July 2012, when he began experiencing chronic fatigue. Tr. 937. He also reported that he was seeing Julian Ambrus, M.D. ("Dr. Ambrus"), at Buffalo General Hospital, for further evaluation of his chronic fatigue. *Id*. On mental status examination, he was calm, not suicidal, and emotionally responsive; had no evidence of psychosis, good concentration and appetite, and his depression was contained. Tr. 938-39. Dr. Joseph stated that Plaintiff would need to see a psychiatrist in Buffalo to continue his medications.  Tr. 939. He noted that Plaintiff's

depression seemed "reasonably contained" and diagnosed "major depression, in remission," and chronic fatigue syndrome. *Id.*

In November 2012, Dr. Ambrus noted that Plaintiff had been referred for "progressively worsening fatigue and exercise intolerance." Tr. 396-97. Plaintiff's physical examination findings were unremarkable. *Id.* Dr. Ambrus noted that Plaintiff had asthma that was "mostly well controlled" and indicated that Plaintiff's test results were "most consistent with myoadenylate deaminase deficiency with secondary mitochondrial dysfunction." Tr. 397. Dr. Ambrus recommended additional testing and a "compound to try of CoQl0 of 200 mg, creatine 1000 mg, carnitine 200 mg, folic acid 1 mg, alpha lipoic acid 150 mg and Ramos 4000 mg 4 times a day." *Id.*

On March 22, 2013, Plaintiff presented to Buffalo General Hospital for a muscle biopsy. Tr. 421. He reported extreme fatigue but denied joint pain or swelling. *Id.* On physical examination, Plaintiff appeared well developed and well nourished; he was in no distress and was alert and oriented to person, place, and time; had no unusual anxiety or depression noted; clear chest and lungs; and full (5/5) strength in the upper and lower extremities and joints with no clubbing, cyanosis, or edema. Tr. 422. He was assessed to have extreme fatigue and muscle weakness. Tr. 422. On March 29, 2013, Plaintiff underwent an electron microscopy for his extreme fatigue, which revealed normal findings; showed no joint pain or swelling; and no diagnosis was given. Tr. 516.

On June 17, 2015, an MRI of Plaintiff's thoracic spine showed normal appearance, normal alignment and normal vertebral body height, normal neural foramina and intervertebral discs, and the spinal cord was normal in size. Tr. 531.

On November 14, 2014 and May 22, 2015, Plaintiff presented to Michael E. Golden, DPT, PT ("Dr. Golden"), at Buffalo Rehab Group, for physical therapy for his bilateral forearm pain. Tr. 970-71. Testing revealed that Plaintiff had full (5/5) strength in his upper extremities bilaterally, except for 4/5 strength in his wrist extension; and almost full range of motion in his wrist flexion and extension and forearm. *Id*. 970-71. Dr. Golden noted that Plaintiff attended ten sessions between May 2015 through August 2015 for his bilateral forearm pain. Tr. 967.

On February 6, 2017, Plaintiff saw Dr. Golden for physical therapy for right calf pain. Tr. 965. On examination, he had 4/5 upper extremity strength with some tenderness, but no elbow pain with range of motion. *Id*.

The record reflects that Plaintiff attended weekly psychotherapy sessions with Ms. Coleman, at Third Wave Psychotherapy, from September 2016 through December 2019. Tr. 703-914, 1030-1323. On mental status examination, Plaintiff was appropriately dressed, interactive, alert, and oriented; and had a depressed mood, constricted affect, good insight and judgment, normal speech, appropriate behavior and thought content, good attention and concentration, and intact memory and functional status. *See id*. On April 3, 2018, Plaintiff expressed interest in "doing some form of massage or energy work." Tr. 799. On August 28, 2018, Plaintiff reported that he "feels he is doing better." Tr. 723.

On May 10, 2017, Plaintiff presented to family medicine practitioner Tajinder Singh, M.D. ("Dr. Singh"), to establish care for his asthma. Tr. 1906. On examination, Plaintiff walked with a normal gait; had normal motor strength and tone in all extremities with no tenderness, cyanosis, edema or varicosities; and intact sensation and reflexes. *Id*. Plaintiff requested additional inhalers and increased his dosage of Flovent and Singulair. Tr. 1907.

Plaintiff presented to Dr. Singh on May 14 and November 28, 2018 for routine follow-up appointments and reported no pain, chest tightness, or joint swelling. Tr. 1913-17. On examination, Plaintiff walked with a normal gait, had normal motor strength and tone in all extremities with no tenderness, cyanosis, edema or varicosities; and intact sensation and reflexes. Tr. 1914, 1918. He appeared healthy and well-developed; was in no distress; was alert and oriented to person, place, and time; had good judgment and normal mood, affect, and memory; he was assessed to have major depressive disorder and asthma. Tr. 1914, 18-19.

On October 18, 2018, Ms. Coleman provided an opinion based on Plaintiff's major depressive disorder, PTSD, and OCD traits. Tr. 658-59. She opined that Plaintiff was "moderately limited" in maintaining attention and concentration; making simple decisions; interacting appropriately with others; and maintaining socially appropriate behavior. Tr. 659.

On February 7, 2019, Plaintiff had a medication follow-up visit with Ms. Gerard. Tr. 697. Plaintiff requested to have his medication adjusted because his "Chinese herbalist" advised him to "decrease and eventually discontinue antidepressants." *Id*. Plaintiff also had follow-up appointments with Ms. Gerard on May 9, 2019, September 12, 2019, and October 24, 2019. Tr. 697, 980. On mental status examination, he was neatly dressed, cooperative, pleasant, alert, and oriented to person, place, and time; had normal speech, coherent thought processes, depressed or anxious mood, mildly constricted affect, and good memory, attention, concentration, insight, judgment, and impulse control. Tr. 697, 980, 1009-11. Ms. Gerard repeatedly diagnosed that Plaintiff's depression was in remission. Tr. 980, 1009, 1012.

Ms. Gerard completed a mental health medical source statement on February 11, 2019, noting that she treated Plaintiff for approximately one year for his depression, post-traumatic stress disorder ("PTSD"), and OCD. Tr. 1000-01. She opined that Plaintiff was "very limited" in carrying

out instructions; maintaining attention and concentration; interacting appropriately with others; maintaining socially appropriate behaviors without exhibiting behavior extremes; and appearing able to function in a work setting at a consistent pace and "moderately limited" in understanding and remembering instructions; and making simple decisions. Tr. 1001. Ms. Gerard believed that Plaintiff's "anxiety, history of trauma, and depression preclude[d] employment." *Id*.

On March 4, 2019, Dr. Liu performed a consultative internal medicine examination. Tr. 953-59. Plaintiff reported a history of asthma and chronic fatigue syndrome, but he could lift up to 25 pounds, walk 0.7 miles, and denied having pain. Tr. 953. Plaintiff also reported he had been diagnosed with mitochondrial disease in 2014 and treated with multiple vitamin treatments until 2015 when he "stopped and followed up with [a] physician [at] Buffalo General Medical Center." *Id*. Plaintiff stated that he completed a college degree in music, and he currently worked five days per week for one hour each day as a customer service representative. Tr. 954. Plaintiff could dress and bathe himself daily, cook, clean, do laundry, perform childcare, watch television, and read books. Tr. 954. On examination, Plaintiff was in no acute distress; walked with a normal gait; walked on heels and toes without difficulty; had a full squat and normal stance; used no assistive devices; and had no difficulty rising from his chair and getting on and off the examination table. Tr. 954.

His musculoskeletal examination showed full flexion, extension, and rotary movement bilaterally in the cervical and lumbar spines; no scoliosis, kyphosis, or abnormality in the thoracic spine; negative straight leg raise bilaterally; full range of motion bilaterally in his wrists, elbows, forearms, shoulders, hips, knees, and ankles; stable and non-tender joints; no redness, heat, swelling, or effusion; no evident subluxations, contractures, ankylosis, or thickening; 5/5 strength in the upper and lower extremities, with no sensory deficits, cyanosis, clubbing, edema, muscle

atrophy, tropic changes, or significant varicosities in the extremities; intact hand and finger dexterity; and 5/5 grip strength bilaterally. Tr. 955.

Dr. Liu diagnosed Plaintiff with history of asthma, sleep apnea, and chronic fatigue syndrome. Tr. 956. He opined that Plaintiff's prognosis was stable; he should avoid dust and other irritating factors due to his asthma; and he had mild limitations in prolonged walking, heavy lifting, and stair climbing due to his chronic fatigue syndrome. *Id*.

Plaintiff also underwent a consultative psychiatric examination on March 4, 2019 with Dr. Jonas. Tr. 960-64. Plaintiff reported he had a bachelor's degree in music and was working five hours per week as a "cold caller" for an insurance company. Tr. 960. He reported that he had met with Ms. Coleman weekly since 2016. Tr. 960. He reported depression, sadness, irritability, loss of energy, anxiety and fatigue; but he had no panic attacks, thought disorders, or manic symptoms. Tr. 960-61.

On mental status examination, Plaintiff was cooperative, well-groomed, and oriented to person, place, and time; had adequate speech, appropriate eye contact, restricted affect, an "okay" mood, good insight and judgment, coherent thought processes, average intellectual functioning, and intact memory, attention, and concentration. Tr. 961-62. Plaintiff reported he could shower and dress himself, cook, clean, do laundry once a week, manage his own money, drive, socialize with others, go on outings occasionally, watch television, listen to music, read, use his computer, and use his cell phone for texting, phone calls, e-mails, social media, and GPS. Tr. 962.

Dr. Jonas opined that Plaintiff had no limitations in understanding, remembering, or applying simple and complex directions and instructions; using reason and judgment to make work-related decisions; interacting adequately with supervisors, co-workers, and the public; regulating emotions, controlling behavior, maintaining well-being and personal hygiene; being

aware of normal hazards and taking appropriate precautions; and sustaining concentration, an ordinary routine, and regular attendance at work;. Tr. 962-63. Dr. Jonas also opined that Plaintiff's psychiatric problems were not significant enough to interfere with his ability to function on a daily basis. Tr. 972. Dr. Jonas diagnosed Plaintiff with unspecified depressive disorder with anxious distress and rule out OCD and recommended that Plaintiff continue with outpatient and psychiatric treatment as currently provided. Tr. 963.

On April 29, 2019, Ms. Gerard indicated that Plaintiff would have intermittent symptoms or exacerbations severe enough that they would cause him to take unscheduled breaks or miss appointments; he would have symptoms that would cause him to take unscheduled breaks; he would be off task 80% of the day; and would miss scheduled appointments or be absent a minimum of 50% of the time. Tr. 1002-05.

On November 30, 2019 and June 30, 2020, Mr. Targee provided opinions regarding Plaintiff's functional limitations. Tr. 1014-20, 1448-54. Mr. Targee indicated that he treated Plaintiff for 18 months in herbal medicine. Tr. 1016. In November 2019, Mr. Targee opined that Plaintiff was incapable of "low stress" jobs and would miss about four days of work per month due to extreme tiredness. Tr. 1017, 1019. Mr. Targee opined similar restrictions in June 2020. Tr. 1451-53. Mr. Targee also specified that he is "not an Allopathic Medical Doctor" but rather, he is an "Ayurvedic Herbalist, trained in the practice of herbal medicine from India and China," and his "comments [were] based in this understanding and not from the 'bio-medical' point of view (emphasis in original)." Tr. 1016.

Ms. Gerard completed a mental residual functional capacity questionnaire on December 2, 2019, noting that she treated Plaintiff from 2017 through 2018 for OCD and depression. Tr. 1023. Ms. Gerard checked off boxes indicating that Plaintiff was unlimited in asking simple questions,

being aware of normal hazards, and adhering to the basic standards of neatness; limited but satisfactory in remembering work-like procedures, maintaining attention and regular attendance, sustaining an ordinary routine, making simple work-related decisions, maintaining socially appropriate behavior, traveling to unfamiliar places, understanding and remembering detailed instructions, and understanding, remembering, and carrying out short instructions; seriously limited in carrying out detailed instructions and using public transportation; and unable to meet competitive standards in working closely with others, completing a normal workday, performing at a consistent pace, dealing with normal work stress, setting realistic goals, interacting appropriately with the general public, and responding appropriately to changes in a routine work setting. Tr. 1025-26. Ms. Gerard opined that Plaintiff would be absent from work four days per month; his symptoms were expected to last longer than 12 months; and he could not engage in full-time competitive employment. Tr. 1027.

On May 14, 2020, Ms. Coleman completed a mental residual functional capacity questionnaire, noting that she had weekly individual therapy sessions with Plaintiff since October 2016 for depression and PTSD. Tr. 1443. Ms. Coleman checked off boxes indicating that Plaintiff was not precluded in maintaining regular attendance, sustaining an ordinary routine, traveling to unfamiliar places, and being aware of normal hazards; precluded for less than ten percent of the workday in making simple work-related decisions, asking simple questions, getting along with co-workers, responding appropriate to changes, understanding and remembering detailed instructions, and understanding, remembering, and carrying out short instructions; precluded from 11 to 20 percent of the workday in working closely with others, carrying out detailed instructions, remembering work-like procedures, and setting realistic goals; precluded by more than 20 percent of the workday in maintaining attention, completing a normal workday, dealing with work stress,

and interacting appropriately with the general public; and precluded in all performance in performing at a consistent pace. Tr. 1445-46. Ms. Coleman opined that Plaintiff would be off task for more than 30 percent of the workday, would be absent for more than four days per month, and his impairments were expected to last more than 12 months. Tr. 1446-47.

On August 19, 2020, B. Aidan Ngin, LHMC ("Mr. Ngin"), completed a letter stating that Plaintiff had been admitted to Brylin Hospital, an acute inpatient psychiatric facility, from August 4, 2020 to August 19, 2020, "due to an increase in acute symptoms relating to his diagnosis of Major Depression, Recurrent, Severe, Generalized Anxiety Disorder with Panic Attacks, and Obsessive Compulsive Disorder." Mr. Ngin noted that Plaintiff was discharged in stable condition and recommended to "re-link" with Ms. Gerard for medication management and Ms. Coleman for counseling. Tr. 1817. The letter further stated that, on August 27, 2020, Plaintiff was linked to ECMC Partial Hospitalization, a two-week intensive program, "to assist with further stabilization of mental health concerns." *Id*.

The discharge summary indicates that Plaintiff reported anxiety, depression, feeling overwhelmed, crying spells, inability to sleep, and stated he felt like cutting himself with a knife, although he did not want to. Tr. 1820. On mental status examination, he was pleasant, cooperative, and oriented to person, place, and time; had a depressed affect and mood, appropriate daily living skills, was working as an online insurance agent, had intact memory, clear senses, average intellectual functioning, impaired insight and judgment, and denied hallucinations. Tr. 1821. Upon discharge, he reported feeling much better overall, was not deemed suicidal or homicidal, and was diagnosed with major depressive and generalized anxiety disorders. Tr. 1822.

Thereafter, on August 27, 2020, Plaintiff was readmitted to Brylin Hospital for suicidal ideations after reporting he wanted to kill himself. Tr. 1921. On mental status examination,

Plaintiff was pleasant, alert, and oriented to person, place, and time; had a depressed mood, constricted affect, intact memory, fair cognition, no homicidal thoughts, and no auditory or visual hallucinations. Tr. 1922. He was diagnosed with bipolar and generalized anxiety disorders. Tr. 1922.

He was discharged on September 22, 2020, with a "much improved" condition after his medications were changed, and he agreed to follow-up with Ms. Coleman. Tr. 1925-27. On mental status examination, he was hopeful, alert, and oriented to person, place, and time; had coherent speech, an improved mood, appropriate affect, intact insight and judgment, intact memory, fair fund of knowledge, goal-directed thought process, no suicidal or homicidal ideations, and no auditory or visual hallucinations. Tr. 1926. During a follow-up appointment on October 5, 2020, he was "much less depressed" and "overall, much more stable." Tr. 1928.

Plaintiff first argues that the ALJ failed to fulfill his duty to adequately develop the record because he did not request missing records from Mr. Targee. *See* ECF No. 8-1 at 11-15. According to Plaintiff, because the ALJ was aware of the missing records, "he should have independently developed these records." *See id*. At the August 21, 2020 administrative hearing, Plaintiff's counsel advised the ALJ that Mr. Targee had submitted a treating source statement, but other records from Ancient Universal Medicine and Mr. Targee had not been submitted.  Tr. 41-42. In response, the ALJ explained that Ancient Universal Medicine was not a medically acceptable source (Tr. 46), and the ALJ would not weigh Mr. Targee's opinion because Mr. Targee identified himself as an herbalist, not a doctor (Tr. 50).

Thereafter, on September 10, 2020, Plaintiff's counsel submitted a letter requesting to keep the record open for an additional two weeks (Tr. 388); the ALJ responded on September 15, 2020, stating that he would leave the record open until September 25, 2020, but if he did not receive any

additional evidence by that date, he would issue a decision without it (Tr. 389). As the ALJ noted in his decision, additional evidence was received, exhibited, and considered by the ALJ in rendering his decision, and the record was complete. Tr. 15.  Notably, however, none of the additional evidence submitted post-hearing was from Mr. Targee or Ancient Universal Medicine. *See* Tr. 1818-1933.

Despite Plaintiff's assertion that Mr. Targee "appears to have multiple degrees" (ostensibly supporting the relevance of his treatment), as well as "spiritual training" (suggesting that he "could be considered clergy") (*see* ECF No. 8-1 at 13-14), Mr. Targee is not licensed to practice healthcare, and therefore, would not be considered a medical source at all under the regulations. *See* 20 C.F.R. § 404.1502(d) ("Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law"); *see also* 20 C.F.R. § 404.1502(e) (listing examples of nonmedical sources). Indeed, Plaintiff acknowledges that, "as an Ayurvedic Herbalist, Mr. Targee would not necessarily be a medical source." *See* ECF No. 9-1 at 17. Accordingly, the ALJ reasonably found that Mr. Targee was not an acceptable medical source, and his opinion was not based on biomedical evidence, and therefore, properly found opinions unpersuasive. Tr. 26.

Plaintiff further argues that, "[t]he ALJ's reasoning shows that he factored in Plaintiff's treatment with Mr. Targee into [*sic*] his decision," but because he didn't have the actual records, the ALJ was unable to properly evaluate the consistency and supportability of Mr. Targee's opinions. *See* ECF No. 8-1 at 11-14. Plaintiff's argument is unpersuasive. First, the ALJ's decision does not indicate that he relied on Plaintiff's treatment history with Mr. Targee to formulate his

conclusions, as Plaintiff suggests. *See id*. Rather, the ALJ's discussion merely referenced Plaintiff's reports to other providers regarding Mr. Targee's treatment recommendations. For example, the ALJ noted that Plaintiff reported to Ms. Gerard in May 2019 that he sees a "Chinese physician" who was helping him with problems related to his liver. Tr. 24, 980, 1007. In September 2019, Plaintiff told Ms. Gerard that "his Chinese Medical Physician" wanted him to get off of Wellbutrin because he felt these medications were causing liver damage. Tr. 24, 1009. Thus, contrary to Plaintiff's argument, the ALJ's conclusions were based on treatment notes from other providers documenting Plaintiff's reports, not Mr. Targee's treatment history. Moreover, the record is clear that the ALJ found Dr. Targee's opinions unpersuasive because Mr. Targee is not an acceptable medical source, and his opinion was not based on biomedical evidence. Tr. 26, 50.

Furthermore, the ALJ is only required to take action to develop the record when (1) the evidence is insufficient to make a disability determination, or (2) the evidence is inconsistent and the ALJ cannot resolve the inconsistency. *See* 20 C.F.R. § 416.920b(b). Neither situation applies here, as the ALJ had before him multiple consultative examiner reports, medical records showing primarily conservative treatment, and Plaintiff's reports regarding his daily activities, which amounts to adequate evidence to make a determination. *See Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 110 (2d Cir. 2020) (ALJ was not faced with "any clear gaps in the administrative record" that gave rise to an affirmative obligation to seek a medical opinion to support the claimant's RFC); *Rosa*, 168 F.3d at 79, n.5 ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information."); *see also Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) ("Given the extensive medical record before the ALJ in this case, we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that

the ALJ failed to obtain a formal opinion from one of MLS's treating physicians . . . ."). Because Plaintiff has not identified any specific gaps in the record, the ALJ was not obligated to further develop the record. Accordingly, the Court finds no error.

Plaintiff next argues that that the ALJ erred in not finding that chronic fatigue syndrome was not a medically determinable impairment. *See* ECF No. 8-1 at 16-19. The ALJ noted that Plaintiff reported in his testimony that he suffered from chronic fatigue syndrome, and/or Epstein Barr syndrome; however, the ALJ explained that the record did not support a finding that this was a medically determinable impairment. Tr. 19. Furthermore, Plaintiff's counsel acknowledged at the hearing that there was no objective medical test or diagnosis stating that Plaintiff had chronic fatigue syndrome. Tr. 47.

As the ALJ noted, laboratory results demonstrated that no Epstein Barr antibody was detected. Tr. 19, 1417. The ALJ also noted that a rheumatological workup in 2012 and 2013 was relatively normal, and despite Plaintiff's reports of fatigue, his physical examination findings were all normal. Tr. 19, 397, 417-21. Furthermore, there was no record that Plaintiff participated in ongoing follow up with the rheumatology clinic. Tr. 19. As the ALJ further explained, while Dr. Liu "assessed history of 'chronic fatigue syndrome with mitochondrial disease,' this assessment was based upon the claimant's report only, and the seronegative findings for any Epstein Barr, refute this report from the claimant." Tr. 19, 956. Based on the foregoing, the ALJ properly determined that the record did not support a finding that chronic fatigue syndrome was a medically determinable impairment.

In his final point of error, Plaintiff argues that the ALJ's assessment of the opinion evidence, and correspondingly, his RFC finding, was not supported by substantial evidence. *See* ECF No. 8-1 at 20-25. A claimant's RFC is the most he can still do despite his limitations and is

assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all the evidence

available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Effective for claims filed on or after March 27, 2017, the Social Security Agency comprehensively revised its regulations governing medical opinion evidence creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (March 27, 2017). Here, Plaintiff filed his claims on January 18, 2019, and therefore, the 2017 regulations are applicable to his claim.

First, the new regulations change how ALJs consider medical opinions and prior administrative findings.  The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the

21

new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the ALJ focuses on the persuasiveness of the medical opinion(s) or prior administrative medical finding(s) using the following five factors: (1) Supportability; (2) Consistency; (3) Relationship with the claimant (which includes: (i) Length of the treatment relationship; (ii) Frequency of examinations; (iii) Purpose of the treatment relationship; (iv) Extent of the treatment relationship; and (v) Examining relationship); (4) Specialization; and (5) Other factors. 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, but they also alter the way the ALJ discusses them in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

Fourth, the regulations governing claims filed on or after March 27, 2017 deem decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements on issues reserved to the Commissioner (such as statements that a claimant is or is not disabled) as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3) (2017). The regulations also make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision" 20 C.F.R. § 416.920b(c).

Finally, Congress granted the Commissioner exceptionally broad rulemaking authority under the Act to promulgate rules and regulations "necessary or appropriate to carry out" the relevant statutory provisions and "to regulate and provide for the nature and extent of the proofs and evidence" required to establish the right to benefits under the Act. 42 U.S.C. § 405(a); *see also* 42 U.S.C. § 1383(d)(1) (making the provisions of 42 U.S.C. § 405(a) applicable to title XVI); 42 U.S.C. § 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration."); *Barnhart v. Walton*, 535 U.S. 212. 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Heckler v. Campbell*, 461 U.S. 458, 466 (1983). Judicial review of regulations promulgated pursuant to 42 U.S.C. § 405(a) is narrow and limited to determining whether they are arbitrary, capricious, or in excess of the Commissioner's authority. *Brown v. Yuckert*, 482 U.S. 137, 145 (1987) (citing *Heckler v. Campbell*, 461 U.S. at 466).

Contrary to Plaintiff's contentions, the ALJ in this case properly analyzed the opinion evidence and the other evidence of record when developing Plaintiff's RFC, and substantial evidence supports the ALJ's RFC finding. Tr. 17-22. *See* 20 C.F.R. §§ 404.1527, 416.927.

First, in determining Plaintiff's physical RFC, the ALJ found the opinion of consultative internal medicine examiner Dr. Liu "partially persuasive overall." Tr. 28. Dr. Liu opined that Plaintiff should avoid dust and other irritating factors due to his asthma, and he had mild limitations in prolonged walking, heavy lifting, and stair climbing due to his chronic fatigue syndrome. Tr. 956. The ALJ noted that "the environmental limitations [assessed by Dr. Liu] are reasonable in consideration of the claimant's history of asthma," but Dr. Liu's opinions relating to Plaintiff's chronic fatigue were unpersuasive since they were "based upon the claimant's report only, rather than objective clinical findings, and are unsupported by Dr. Liu's physical findings on examination, which were within normal limits." Tr. 27-28, 954-56.

Dr. Liu's examination findings were also consistent with the normal objective medical findings in the record. Tr. 25-28. For example, diagnostic imaging was largely unremarkable. On June 17, 2015, an MRI of Plaintiff's thoracic spine showed normal appearance, normal alignment and normal vertebral body height, normal neural foramina and intervertebral discs, and the spinal cord was normal in size. Tr. 531. Similarly, the ALJ noted that Plaintiff's treatment notes were minimal and showed normal physical examination findings. Tr. 22-28. For instance, during Plaintiff's treatment sessions for his asthma with Dr. Singh, Plaintiff walked with a normal gait, had normal motor strength and tone in all extremities with no tenderness, cyanosis, edema or varicosities; and intact sensation and reflexes. Tr. 1907, 1914, 1918. Moreover, during Plaintiff's physical therapy sessions for his bilateral forearm pain, he had full (5/5) strength in his upper extremities bilaterally and almost full range of motion in his wrist flexion and extension, and in his forearm. Tr. 965, 970-71.

Notably, even under the prior regulations that gave deference to treating source opinions, the report of a consultative examiner, such as Dr. Liu, could constitute substantial evidence to

support an ALJ's findings when supported by other record evidence. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). See 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c). *See e.g., Trepanier v. Comm'r of Soc. Sec. Admin.*, 752 F. App'x 75, 78 (2d Cir. 2018) (substantial evidence supported ALJ's RFC finding; ALJ "largely relied on the report of a consultative examiner"); *see also Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011); *Lamond v. Astrue*, 440 F. App'x 17, 21-22 (2d Cir. 2011).

The ALJ also found "persuasive overall" the prior administrative medical findings of state agency medical consultants Dr. Miller and Dr. Lawrence, who opined that Plaintiff could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds; stand, sit, or walk for six hours in an eight-hour workday; was unlimited in pushing and pulling, had no postural or manipulative limitations, and should avoid concentrated exposure to fumes, dust, odors, and gases. Tr. 28, 92-93, 117-18. The ALJ reasonably found that these opinions were consistent with, and supported by, the objective medical findings discussed above. Tr. 28, 531, 965, 970-71, 1907, 1914, 1918.

The ALJ found that the above opinions were supported by, and consistent with, the unremarkable treatment notes, as discussed above. Tr. 18-23. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (supportability and consistency are the most important factors in determining persuasiveness of medical opinions), (c)(1) (the more relevant evidence and supporting explanations presented by a medical source in support of an opinion, the more persuasive the opinion will be), (c)(2) (the more consistent a medical opinion is with other evidence in the record, the more persuasive the medical opinion will be). Accordingly, the ALJ explained that he accounted for these physicians' opinions and findings in the record by limiting Plaintiff to a reduced range of light work, such that he could occasionally lift and carry up to 20 pounds,

frequently lift and carry up to 10 pounds, sit/stand/walk for up to six hours in an eight-hour day; frequently balance and stoop; occasionally kneel, crouch, and climb ramps or stairs; never crawl or climb ladders, ropes, or scaffolds; and work in no concentrated exposure to pulmonary irritants, such as odors, fumes, dust, gases or poor ventilation. Tr. 20-21, 28. Accordingly, the ALJ's physical RFC finding was supported by substantial evidence.

The ALJ also properly evaluated the opinion evidence in determining Plaintiff's mental RFC. The ALJ reasonably found "persuasive overall" the opinion of consultative psychiatric examiner Dr. Jonas. Tr. 27. Dr. Jonas opined that Plaintiff had no limitations in understanding, remembering, or applying simple and complex directions; using reason and judgment to make work-related decisions; interacting adequately with supervisors, co-workers, and the public; sustaining concentration and performing tasks at a consistent pace; sustaining an ordinary routine and regular attendance at work; regulating emotions, controlling behavior, maintaining well-being and personal hygiene; and being aware of normal hazards and taking appropriate precautions. Tr. 27, 962-63.

As the ALJ explained, Dr. Jonas' opinion was supported by his largely normal mental status examination findings, which showed that Plaintiff was cooperative, well-groomed, and oriented to person, place, and time; had adequate speech, appropriate eye contact, an okay mood, good insight and judgment, coherent thought processes, average intellectual functioning, and intact memory, attention, and concentration. Tr. 23-24, 27, 961-62. Plaintiff also reported to Dr. Jonas that he showers and dresses himself, cooks, cleans, does laundry, manages his own money, drives, socializes with others, goes to outings occasionally, watches television, listens to music, reads, uses his computer, and uses his phone to text and call others and for social media. Tr. 962.

Similarly, the ALJ noted that Dr. Jonas's opinion was consistent with the largely unremarkable mental health treatment notes in the record. Tr. 20-28. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (supportability and consistency are the most important factors in determining persuasiveness of medical opinions). For instance, on mental status examination, Plaintiff was routinely appropriately dressed, cooperative, pleasant, interactive, alert, and oriented to person, place, and time; and had good insight and judgment, normal mood and affect, normal speech, coherent thought processes, appropriate behavior and thought content, good attention and concentration, and intact memory and functional status, no delusions or hallucinations, and no suicidal or homicidal ideations. Tr. 697, 703-914, 980, 1009-11, 1030-1323, 1821, 1847, 1914, 1922, 1926. Furthermore, during his psychiatric examination with Dr. Joseph in June 2012, Plaintiff was calm, not suicidal, and emotionally responsive; he had no evidence of psychosis, good concentration and appetite, and his depression was contained. Tr. 938-39.

Accordingly, the ALJ accounted for Dr. Jonas' opinion and findings in the record by limiting Plaintiff to the following non-exertional limitations in the RFC: he would be limited to simple routine tasks that can be learned after a short demonstration, or within 30 days; work that does not require teamwork, such as on a production line, and which would require doing the same tasks every day with little variation in location, hours or tasks. Tr. 21-22.

Plaintiff contends that the ALJ did not properly assess the supportability and consistency factors when considering the opinions of mental health providers Ms. Gerard and Ms. Coleman. *See* ECF No. 8-1 at 20-25. However, a review of the record and the ALJ's decision reflects that the ALJ thoroughly considered these opinions and provided well-supported reasons for finding them "unpersuasive." Tr. 26-27. First, the ALJ noted that the record contained several opinion statements from Ms. Gerard. Tr. 26, 699-700, 1021-27, 996-1013. The ALJ further noted that Ms.

Gerard's repeated diagnoses of depression, in remission, as well as treatment notes showing essentially normal mental status findings were unsupportive of the degree of limitations set forth in her opinion statements. Tr. 26, Tr. 697, 703-914, 980, 1009-11, 1030-1323. 980, 1009, 1012.

The ALJ also discussed Ms. Gerard's statement that Plaintiff was "disabled psychiatrically," noting that her statement was conclusory and not expressed in functional terms, and furthermore, it was an opinion on an issue reserved to the Commissioner, which is inherently neither valuable nor persuasive. Tr. 26, 999. Accordingly, the ALJ was not required to provide any articulation about this evidence. *See* 20 CFR 404.1520b(c) and 416.920b(c). The ALJ further noted Ms. Gerard's statement that Plaintiff was unable to work due to, among other things, Epstein Barr virus, which as previously discussed, was merely reported to providers in the record but not supported by any objective findings. Tr. 26-27, 1000. Thus, as the ALJ reasonably found, Ms. Gerard's reliance on an undiagnosed Epstein Barr virus as a basis for her opinions, along with the overall lack of support for her opined limitations, further undermined the validity of her opinions. Tr. 26.

The ALJ found Ms. Coleman's opinions unpersuasive for similar reasons. Tr. 26. Notably, her opinion was vague and not expressed in functional terms; it was unsupported by her own examination findings and treatment notes, and she similarly attributed Plaintiff's symptoms and limits, in part, to an undiagnosed Epstein Barr virus Tr. 27, 1446.

Notably, both Ms. Gerard and Ms. Coleman outlined their limitations on check-box forms for the Department of Social Services ("DSS"). *See* Tr. 1001, 1025-27, 1445-47. As the ALJ explained, however, DSS forms are "based upon that administrative agency's standards for determining if an individual is disable, which standards are different than those for Social Security." Tr. 27. Accordingly, these findings are not binding on the Commissioner. *See* 20 C.F.R.

§§ 404.1504, 416.904 (determination by a non-governmental agency or governmental agency for other purposes is not binding on the Commissioner); *see also Claymore v. Astrue*, 519 F. App'x 36 (2d Cir. 2014) (same).

The ALJ further explained that Ms. Gerard and Ms. Coleman's opinions were inconsistent with the largely normal mental status examination findings, which showed that Plaintiff was calm, not suicidal, and emotionally responsive; he had no evidence of psychosis, good concentration and appetite, and his depression was contained. Tr. 24-25, 938-39. Although Plaintiff was admitted to the hospital in August 2020 for depression and anxiety, by the time of discharge, he was in stable condition and felt much better overall. Tr. 1822. As the ALJ noted, it also appeared that Plaintiff had been without outpatient treatment prior to his hospitalization. Tr. 24, 1817. Moreover, mental status examination findings showed he was pleasant, cooperative, alert, and oriented to person, place, and time; had appropriate daily living skills, intact memory, clear senses, average intellectual functioning, an improved mood, appropriate affect, intact insight and judgment, goal-directed thought process, no suicidal or homicidal ideations, and denied any hallucinations. Tr. 1821-22, 1922, 1926. Notably, the discharge note stated that Plaintiff was able to work three hours per week as an insurance agent online, which contradicts Plaintiff's assertion that he was totally disabled. Tr. 1821. *See* 20 C.F.R. §§ 404.1571, 416.971 (explaining that even if the work a claimant had done was not substantial gainful activity, it may show that the claimant can do more work than he actually did). Moreover, during a follow-up appointment on October 5, 2020, Plaintiff was "much less depressed" and "overall, much more stable." Tr. 1928.

Furthermore, the ALJ relied on a variety of other evidence to conclude that Plaintiff's allegations of disabling symptoms and limitations were not supported. *See* Tr. 22-28; 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p. As explained above, RFC is an administrative finding, not a medical one. The regulations explicitly state that the issue of RFC is "reserved to the

Commissioner" because it is an "administrative finding that [is] dispositive of the case." 20 C.F.R.

§§ 404.1527(d), 416.927(d). The ALJ "will assess your residual functional capacity based on all

of the relevant medical and other evidence," not just medical opinions. 20 C.F.R. § 404.1545(a);

20 C.F.R. §§ 404.1513(a)(1), (4), 416.913(a)(1), (4) (explaining that evidence that can be

considered includes objective medical evidence, such as medical signs and laboratory findings; as

well as evidence from nonmedical sources, including the claimant, such as from forms contained

in the administrative record).

Thus, opinion evidence is only one type of evidence an ALJ is required to consider. *See* 20

C.F.R. §§ 404.1520(e), 416.920(e) ("we will assess the residual functional capacity based on all

the relevant medical and other evidence in your case record"); 20 C.F.R. §§ 404.1545(a)(3),

416.945(a)(3) (explaining that the adjudicator will assess the RFC based on all the relevant

evidence in the case record); 20 C.F.R. §§ 404.1513(a)(1),(4), 416.913(a)(1),(4) (explaining that

evidence that can be considered includes objective medical evidence, such as medical signs and

laboratory findings; as well as evidence from nonmedical sources, including the claimant, such as

from forms contained in the administrative record); *Matta*, 508 F. App'x at 56 ("Although the

ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited

in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that

was consistent with the record as a whole.").

Here, the ALJ also considered Plaintiff's reported activities to support the RFC assessment.

Tr. 26. *See Monroe v. Comm'r of Soc. Sec.*, No. 16-1042-cv, 676 F. App'x 5, at *8-*9 (2d Cir.

2017) (the ALJ properly considered evidence of the claimant's activities when assessing RFC).

The record shows that Plaintiff was able to bathe, dress, and groom himself; cook, clean, do

laundry, perform childcare, go grocery shopping, use public transportation, apply for jobs, exercise

and meditate, manage finances, walk his dog multiple times per day, drive, read books, watch television, listen to the radio, socialize with friends, go to outings, use his phone to text, and use his computer for social media. Tr. 22-28, 305-09, 954, 962. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i), (adjudicator properly considers the individual's daily activities); SSR 16-3p; *see also Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (holding that Plaintiff's activities of daily living was an important indicator of her true level of physical functioning).

The ALJ also discussed Plaintiff's treatment modalities. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v) (adjudicator properly considers the treatment modalities utilized, and the effectiveness of treatment to relieve pain and other symptoms). For instance, although Plaintiff was hospitalized briefly for his depression and anxiety, the record suggests that Plaintiff was not attending outpatient treatment prior to his hospitalization. Tr. 24, 1817. He was discharged in stable condition and reported feeling "much better" overall after his medications were changed. Tr. 1822, 1925-27. Similarly, during a follow-up appointment, he was "much less depressed" and "overall, much more stable." Tr. 1928.

Notably, during the relevant period, Plaintiff was working part-time as an online insurance agent providing customer service to clients, specifically, answering clients' questions about their investments. Tr. 55-56, 954, 960, 1821. He also reported to Ms. Coleman that he "feels he is doing better" (Tr. 723) and expressed interest in doing massage or energy work. (Tr. 799). He previously earned a bachelor's degree in fine arts. Tr. 954, 960. Plaintiff also stated in his function report that he has no problems paying attention, can finish tasks he starts, follow spoken and written instructions, and has no problems getting along with others or remembering things. Tr. 311-12.

The ALJ also properly considered that, during the relevant period, Plaintiff's primary source of treatment was medication and counseling. Tr. 23, 703-914, 1030-1323. *See* 20 C.F.R. §§

404.1569(c)(3)(iv)- (v), 416.929(c)(3)(v) (the ALJ considers the treatment, other than medication, a claimant receives for relief of her symptoms). The Second Circuit has found that a claimant's receiving only conservative treatment is evidence that can weigh against allegations of disabling symptoms. *See Botta v. Colvin*, 2016 WL 6117724 at *1 (2d Cir. Oct. 19, 2016); *see also Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2013) (evidence of a conservative treatment regimen supported the ALJ's determination that plaintiff's symptoms were not as severe as she alleged); *Snyder v. Comm'r of Soc. Sec.*, 840 F. App'x 641, 643 (2d Cir. 2021) (conservative treatment may weigh against a disability finding) (internal citations omitted).

Based on the foregoing, Plaintiff's daily activities and treatment modalities do not support a finding that Plaintiff's condition is disabling. Accordingly, the ALJ properly considered the totality of the evidence when determining Plaintiff's RFC, and substantial evidence supports the ALJ's RFC determination.

Moreover. as previously noted, Plaintiff bears the ultimate burden of proving that he was more limited than the ALJ found. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so."); *Poupore*, 566 F.3d at 306 (it remains at all times the claimant's burden to demonstrate functional limitations, and never the ALJ's burden to disprove them). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which he has failed to do.

For all the reasons discussed above, the Court finds that the ALJ properly considered the evidence of record, including the treatment records, the opinion evidence, Plaintiff's daily activities, and his relatively conservative treatment, and the ALJ's findings are supported by substantial evidence. Accordingly, the Court finds no error.

When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 8) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 10) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE